99 F.3d 1147
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Ronald L. BAILIE, d/b/a Bailie School of Broadcast, Terri
Bailie, Nada B. Bailie, d/b/a Bailie School of
Broadcast, Defendants-Appellants.
 No. 96-30047, 96-30048, 96-30049.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted July 11, 1996.
Decided Oct. 08, 1996.
 
 Before: REAVLEY,* REINHARDT and WIGGINS, Circuit Judges.
 
 
 1
 MEMORANDUM**
 
 
 2
 The convictions and sentences of Ron, Nada, and Terri Bailie (collectively the Bailies) for conspiracy, making false statements and the misapplication or embezzlement of federal funds are affirmed.
 
 
 3
 1. Criminal Misapplication of Perkins Loan funds
 
 
 4
 The Bailies were charged in counts 8 through 10 with "knowingly and willfully misapplying or embezzling Perkins Loan Funds in violation of 20 U.S.C. § 1097(a) of Title 20 of the United States Code."[1] The Bailies contend that the government should be required to prove as an element of the criminal misapplication charge that they possessed the "intent to defraud" the government. The judge instructed the jury contrary to that position. The judge instructed the jury that it is not a defense that "the defendants may have intended to repay the funds at the time they were taken." Nor was it a defense if the defendants "believed they eventually would be entitled to the funds, if at the time funds were taken defendants acted knowingly and with the intent to appropriate the funds to a use inconsistent with the rights of the Department of Education." We believe this instruction was correct and meets the critical issue here.
 
 
 5
 A district court's formulation of jury instructions is reviewed for an abuse of discretion. United States v. Joetzki, 952 F.2d 1090, 1095 (9th Cir.1991). The inquiry is "whether the jury instructions as a whole are misleading or inadequate to guide the jury's deliberations." Id. Whether a jury instruction misstates elements of a statutory crime, however, is a question of law subject to de novo review. United States v. Mann, 811 F.2d 495, 496-97 (9th Cir.1987).[2]
 
 
 6
 We begin with the simple premise that the definitions of federal crimes are entrusted to the legislature. Liparota v. United States, 471 U.S. 419 (1985); United States v. Nguyen, 73 F.3d 887, 890 (9th Cir.1995). Our interpretation of those crimes begins with the language of the statute. 20 U.S.C. § 1097(a) provides:
 
 
 7
 Any person who knowingly and willfully embezzles, misapplies, steals, obtains by fraud, false statement or forgery, or fails to refund any funds, assets or property provided or insured under this subchapter and part C of subchapter I of chapter 34 of Title 42....
 
 
 8
 The statute itself does not contain the language or requirement of "intent to defraud." Had Congress intended to require such a showing they clearly knew how to do so.[3] This is demonstrated by Congress's language in subsection (d) of the same statute which provides,
 
 
 9
 Any person who knowingly and willfully destroys or conceals any record relating to the provision of assistance.... or attempts to so destroy or conceal with intent to defraud the United States or to prevent the United States from enforcing any right obtained in subrogation under this part, shall upon conviction thereof, be fined not more than $20,000 or imprisoned not more than 5 years, or both.
 
 
 10
 20 U.S.C. § 1097(d) (emphasis added).
 
 
 11
 On the face of the statute, the language of § 1097(a) does not require an "intent to defraud or injure." This statute is similar to the phrase "knowing conversion" considered by the Supreme Court in Morissette v. United States, 342 U.S. 246 (1952). In Morissette, the Court defined "knowing conversion" as "requir[ing] more than knowledge that defendant was taking the property into his possession. He must have knowledge of the facts, though not necessarily the law, that made the taking a conversion." Id. at 271. As with conversion, we believe that misapplication may be consummated without "any intent to keep and without any wrongful taking, where the initial possession by the converter was entirely lawful." Id. at 272.
 
 
 12
 In support of their position, the Bailies cite to the Eleventh Circuit's decision in United States v. Kammer, 1 F.3d 1161, 1165 (11th Cir.1993). There the court determined that in order to prove criminal misapplication, the government must show "(1) a conversion of the property to the use of the defendant or a third party, and (2) fraudulent intent." In Kammer, the court determined that there was no proof of a conversion or of fraudulent intent.
 
 
 13
 We are not persuaded by Kammer. First, we believe that the facts in the instant case differ significantly from those in Kammer. Kammer owned and operated a vocational training school in Mobile, Alabama. When the students were awarded Pell Grants through the Department of Education, the school held those funds in trust for the student. See 34 C.F.R. § 668.16. When the students enrolled, the school would withdraw the funds from the trust account and deposit the funds into their operating account. If, however, the student withdrew from the school, the regulations required that the school refund the unearned portion to the federal trust fund within 30 days. See 34 C.F.R. § 668.22(e)(5).
 
 
 14
 The government sought to prove that Kammer had misapplied Department of Education funds because the school had failed to refund the moneys in a timely manner. The Eleventh circuit noted that the regulations permitted an institution to commingle federal financial aid funds with other money. 34 C.F.R. § 690.81(b). In the face of the government's contention that Congress intended to criminalize the failure to refund any money, the court noted that because the school was permitted to commingle funds it was probable that the school may not be able to promptly make a refund.
 
 
 15
 In the instant case, while the Bailies apparently also failed to make numerous refunds, the government did not pursue that theory at trial. Rather the government focused upon the Bailies acts in taking money from the Perkins Loan Program and using these funds for the general operation of this school or for placing those funds in their personal accounts. This is not a case where the Bailies legitimately removed funds from the account and failed to replace the funds.
 
 
 16
 Second, the court in Kammer relied in part upon interpretations of 18 U.S.C. § 656 concerning the misapplication of bank funds where courts have required the government to prove the additional element of intent to defraud or injure the bank. That interpretation, however, rests upon the peculiar statutory history of section 656, which revised former section 12 U.S.C. § 592. See Ramirez v. United States, 318 F.2d 155, 157 (9th Cir.1963). While the words "intent to injure or defraud" were not contained in the revision, they did exist in the original. Id. The reviser's notes state that the revision was not intended to change in any way the "meaning or substance of existing law." Id. at 158. Therefore, courts have read the additional element into section 656.
 
 
 17
 On the facts of Kammer, it may be desirable to make "intent to defraud" an element of the crime to prevent criminalizing innocent conduct. However, where the criminal conduct is not the failure to refund funds, but is instead the misapplication or embezzlement of those funds, we do not interpret the language of the statute to include "intent to defraud." This is especially true where, as here, Congress included the very language at issue in another portion of the statute.
 
 2. Deliberate Ignorance Instruction
 
 18
 In counts 2-7, the Bailies were charged with making false statements on the Fiscal Operations Report and Application to Participate (FISAP) of each of the schools. The FISAPs included a line identifying the "cash on hand and in depository" in the Perkins Loan account. For example the FISAP filed for the San Francisco school indicated a cash on hand in the school's bank account in the amount of $52,446. The actual amount was $11.47. Overall, the FISAPs for the six schools indicated a total cash on hand of $162,418. The accounts had $94.82. The FISAPs were filed on a computer disk accompanied by a certification by the school that "the information contained in this form is in compliance with governing legislation and regulation and is true and accurate to the best of our knowledge." All three defendants signed the accompanying certification for each of the six FISAPs filed with the Department of Education. Once the disks were sent to the Department of Education, the Department would return hard copies of the document to the school for "edits."
 
 
 19
 There was a dispute at trial as to whether the Bailies had knowledge of the "cash on hand" amount represented in the FISAP. Ronald Bailie testified that he signed the "cover sheet" without knowledge of the "cash on hand" figures and without knowledge of the misrepresentation. Betty Sabo, the school's accountant in charge of preparing the FISAPs, testified that in September of 1989, she and the Bailies met and discussed the problem that the cash on hand figures did not match the actual amounts in the bank accounts. At the meeting Nada told Ms. Sabo that "it appeared that their funding was coming through really soon and that the FISAPs would be able to go out before the edits came back, that the money would be in the account." In October of 1989, Ms. Sabo delivered a memo to the Bailies concerning the shortages in the accounts. She wrote:
 
 
 20
 Since I very much doubt that in the near future the funds will be available to make the final required adjustments and disbursements to complete the transactions for the 88/89 fiscal year, I gladly offer any necessary assistance in explaining any of the information regarding final adjustments and disbursements, both of which are due in December. After I leave, I also will be available by phone to answer any questions on items that maybe unclear.
 
 
 21
 I am concerned about the liability due to the [Perkins Loan] program in all the schools. I strongly advise you to contact your attorney on the legal ramifications of the overdrawn funds for collection activities. (Please see attached schedule). The amounts I have listed are for the end of the 1988/89 fiscal year and do not reflect any activity since then. The amounts owing do reflect an estimated amount due, but I did book an average monthly 33 1/3 collection draw for the months that AFSA runs were not available to calculate the actual 33 1/3 collection draw. As you can see some of the schools have a sizable liability due back to the [Perkins Loan] program.
 
 
 22
 Sabo testified that she attached a schedule to her letter which indicated the proper amounts that should be in the Perkins Loan accounts.
 
 
 23
 The knowledge of the defendants was an issue at trial. The district court gave a "deliberate ignorance" instruction to the jury.[4] Originally this instruction was requested by the government, but during the charge conference government counsel explicitly requested that the instruction not be given. Defense counsel requested that the instruction be given. The Bailies argue that the instruction should not have been given. If we determine that it was invited, the Bailies assert that counsel was ineffective for requesting the instruction.
 
 
 24
 Without question the error was invited by defense counsel. Assuming that it was error for the court to give a deliberate ignorance instruction, we do not believe that error rose to the level of an "exceptional situation" where reversal is necessary to preserve the "integrity of the judicial process" or to prevent a "miscarriage of justice." Guam v. Alvarez, 763 F.2d 1036, 1038 (9th Cir.1985) (quoting Marshall v. United States, 409 F.2d 925, 927 (9th Cir.1969)).
 
 
 25
 We also do not believe that counsel's error, assuming it was error, constitutes ineffective assistance of counsel. To demonstrate ineffective assistance of counsel, the Bailies must show that counsel's error fell below an objective standard of reasonable professional assistance, and that the errors "were so serious so as to deprive the defendant a fair trial, a trial whose result is reliable." Strickland v. Washington, 466 U.S. 668, 687 (1984). The Bailies cannot demonstrate that they were deprived of a fair trial. The evidence presented a simple choice for the jury. The jury could believe Ron Bailie who testified that he did not see the FISAP before it was sent to the Department of Education, and that he was unaware of any discrepancies that existed. This evidence was partially supported by the testimony of the office manager, who stated that often the FISAP cover sheet was signed separate and apart from the actual FISAP. Or the jury could believe the testimony of Sabo, who testified that she informed all three Bailies of the discrepancies between the cash on hand figures in the FISAPs and the account statements from the Bank. She further testified that the three defendants acknowledged the discrepancy and said they planned to deposit the correct amounts into the accounts before the edits were returned to the Department of Education. The jury chose to believe Sabo and not Ronald Bailie. Sabo's testimony indicated not that Ronald refused to look at the FISAPs before he signed the cover sheet to avoid any knowledge of a discrepancy, but rather, that he knew that the FISAPs were incorrect when they were sent to the Department of Education. Therefore, no prejudice is shown.
 
 3. Adverse Inference Instruction
 
 26
 Terri and Nada Bailie assert the trial court erred in instructing the jury that they should not draw "an adverse inference" from their failure to testify.[5] The district court did instruct the jury that,
 
 
 27
 The indictment is not evidence. The defendants are presumed to be innocent and do not have to testify or present any evidence to prove innocence. The government has the burden of proving every element of the charge beyond a reasonable doubt. If it fails to do so, you must return a not guilty verdict.
 
 
 28
 However, counsel for Nada and Terri Bailie objected to this instruction and proposed an instruction that contained language similar to the court's instruction but also informed the jury that they were not to "infer" any guilt from the defendant's decision not to testify.
 
 
 29
 In Carter v. Kentucky, the Supreme Court held that, "[j]ust as adverse comment on a defendant's silence 'cuts down on the privilege by making its assertion costly,' the failure to limit the jurors' speculation on the meaning of that silence, when the defendant makes a timely request that a prophylactic instruction be given, exacts an impermissible toll on the full and free exercise of the privilege." 450 U.S. 288 305 (1981) (quoting Griffin v. California, 380 U.S. 609, 614 (1965). The government asserts that the general instruction given adequately communicates that no adverse inferences may be drawn from the fact that a defendant chooses not to testify. The government further argues that Carter stands only for the proposition that a court give a general instruction that a defendant has the right not to testify.
 
 
 30
 We disagree with the government's interpretation of Carter. The Court in Carter relied in part upon Griffin v. California, where a similar instruction was given. However, in Griffin the trial court added language that permitted the jury to take the defendant's failure to testify "into consideration as tending to indicate the truth of [the State's] evidence and as indicating that among the inferences that may be reasonably drawn therefrom those unfavorable to the defendant are the more probable." Carter, 450 U.S. at 297 (quoting Griffin, 380 U.S. at 610). Clearly the Supreme Court's analysis in Carter recognizes that the Court was not merely using the "no adverse inference" language as a general reference to language instructing a jury of a defendant's general right not to testify.
 
 
 31
 The government also seeks solace in the First Circuit's opinion in United States v. Ladd, 877 F.2d 1083 (1st Cir.1989). The Government interprets Ladd to hold that no particular language for an instruction about a defendant's right to remain silent is required. While it is true that the First Circuit has not required the use of the exact wording requested by a defendant, the court is required, upon request, to give an instruction "to minimize the danger that the jury will give evidentiary weight to a defendant's failure to testify." Carter, 450 U.S. at 305; United States v. Brand, 80 F.3d 560, 567 (1st Cir.1996); Ladd, 877 F.2d at 1089. The court in Brand recognized the very difficulty at issue here, that is, the jury is given a general instruction about a defendant's right not to testify but it is not told that it cannot draw an adverse inference from such failure. The court in Brand held, "Carter v. Kentucky makes clear that, once request for no-adverse-presumption instruction has been made, the 'full and free exercise' of the constitutionally guaranteed privilege against self-incrimination requires more than instruction on the right not to testify and to be presumed innocent until proven guilty." 80 F.3d at 567. We agree with Brand's interpretation of Carter. In Brand the court chose not to reverse the defendant's convictions because the error had been forfeited, and the court, based upon the evidence at trial, did not believe the error "could have seriously affected the fairness of the proceedings." 80 F.3d at 567-68. Unlike in Brand, the error was properly preserved in this case. Both counsel for Nada and Terri objected to the court's instruction and offered a proposed instruction containing the "no adverse inference" language. This error is not structural. Brand, 80 F.3d at 568; see Arizona v. Fulminante, 499 U.S. 279, 308 (1991). Therefore, we must determine whether the error was harmless.
 
 
 32
 The evidence indicates that Nada and Terri were both aware of the significant restrictions placed upon the Perkins loan funds. They knew that the fund was being held by the school in trust and that the school had a fiduciary responsibility in the administration of the fund. Both were on notice of particular problems with the fund after the 1987 audit. They were also specifically informed by Betty Sabo that substantial funds were missing from the federal accounts. There was also evidence that loans had been made without a student designated to receive those funds. Despite all this, they both signed FISAPs which included substantial misstatements concerning the amount of cash on hand in the banks.
 
 
 33
 Finally, the evidence clearly indicates there was a misapplication/embezzlement of government funds. Terri deposited student loan repayment checks into her personal account.
 
 
 34
 The failure to instruct the jury was harmless.
 
 4. Evidentiary Rulings
 
 35
 The Bailies contend the district court erred with respect to two evidentiary rulings during trial. First, they argue the district court erred in admitting civil regulations concerning the accounting and use of Perkins Loan funds. Second, they argue that the district court erred in admitting evidence of the Bailies extravagant lifestyle.
 
 
 36
 The defendants violated numerous regulations in the accounting and use of government Perkins Loan funds. The court cautioned the jury of the limited use of this evidence.[6] The Bailies assert that "evidence of violation of a number of regulations was used by the government to argue that the defendants did not have an entitlement to the funds which were allegedly taken by them, and that they misapplied those funds. This was not background information or as evidence of motive or intent. This was introduced to establish an element of the charged offense of misapplication." However, the Bailies do nothing to sort out which evidence was admissible and which evidence was not.
 
 
 37
 The central issue in the trial was whether the Bailies "knowingly and willfully embezzled or misapplied" funds and whether they "knowingly made false statements." The government argues that the Bailies' knowledge of the civil statutes and its requirements were relevant to the jury's determination on these points. See United States v. Brown, 912 F.2d 1040, 1042 (9th Cir.1990) ("There is an undoubted danger in the use of regulations in this area, but we have made it quite clear that it is proper to use them as background."); United States v. Smith, 891 F.2d 703, 710 (9th Cir.1989), cert. denied, 498 U.S. 811 (1990) (evidence of violation of civil statute may be introduced to show a defendant's motive); United States v. Wolf, 820 F.2d 1499, 1504-05 (9th Cir.1987), cert. denied, 485 U.S. 960 (1988) (evidence of violation of civil regulation is not admissible where it is used "to supply a crucial element" in the government's case). We agree that the evidence was admitted for a proper purpose.
 
 
 38
 The Bailies also argue that the district court erred in admitting prejudicial evidence of their extravagant lifestyle. The government argues that the evidence of their opulent lifestyle, including homes, condos, expensive cars and a chauffeured limousine was probative of the Bailies' motive in committing the crimes charged.
 
 
 39
 In support of their argument the Bailies cite United States v. Copple, 24 F.3d 535 (3d Cir.), cert. denied, 115 S.Ct. 488 (1994), where the court found that evidence of the impact of the losses upon a victim's life was error. In this case, however, the evidence does demonstrate the Bailies' motive to keep the broadcasting school alive to support their affluent lifestyle. The trial court did not abuse its discretion in admitting the evidence.
 
 5. Sentencing
 
 40
 A. Adequacy of the district court's findings
 
 
 41
 The district court's factual findings in sentencing are reviewed for clear error. United States v. Leung, 35 F.3d 1402, 1405 (9th Cir.1994), cert. denied, 115 S.Ct. 954 (1995). The district court should make clear on the record its resolutions of all disputed matters, and specific findings of fact are encouraged. United States v. Ing, 70 F.3d 553, 557 (10th Cir.1995); Leung, 35 F.3d at 1406 (quoting United States v. Peters, 962 F.2d 1410, 1415 n. 2 (9th Cir.1992)). All that is required is that the defendant be given an opportunity to dispute any facts relevant to the sentencing decision. Leung, 35 F.3d at 1406.
 
 
 42
 Each of the three defendants made extensive objections to the sentencing recommendations and those objections were heard and ruled upon.
 
 
 43
 The court stated after sentencing Ronald and Terri that "[t]he justification for the sentence is that set forth in the presentence report together with those additional comments I have made here today." He forgot to do so after he sentenced Nada. Nevertheless, it is clear from the hearing that is what was intended.
 
 B. Amount of Loss
 
 44
 The Bailies also assert that the district court improperly used the "actual" loss to calculate damages rather than the "intended" loss. See United States v. Shaw, 3 F.3d 311 (9th Cir.1993) (distinguishing between "intended" and "actual" loss). Although this argument was not raised at sentencing, the Bailies argue now that it was before the court because each defendant objected to the calculation based upon the fact that they turned over approximately $80,000 to bankruptcy court. The government correctly points out that these arguments are not the same. The Bailies are not entitled to a reduction of a loss amount for offense level purposes by returning some of the proceeds through the bankruptcy proceedings. United States v. Arjoon, 964 F.2d 167, 172 (2d Cir.1992); see also U.S.S.G. § 2B1.1 (application note 2 defining loss as "the value of the property taken, damaged or destroyed").
 
 C. Abuse of Trust Enhancement
 
 45
 The Bailies contend that the court erred in enhancing their sentence for "abuse of trust." See U.S.S.G. § 3B1.3 and application note 1. They argue that this is an improper double punishment for their crime. In United States v. Christiansen, the circuit determined that the enhancement would apply to embezzlers when the breach of trust was particularly egregious. 958 F.2d 285, 287 (9th Cir.1992). And the court should look at the particular role of the individual involved and whether she exploited her "trust" position to facilitate the offense. Id. at 288. In this case, the three defendants used their "trust" position with regard to the United States government to facilitate the offense.
 
 
 46
 D. Ronald Bailie Enhancements for Abuse of Trust and Leadership
 
 
 47
 Ronald Bailie objects to the district court's use of both the abuse of trust enhancement and the leadership enhancement. U.S.S.G. § 3B1.3 provides that "[i]f this adjustment is based upon an abuse of a position of trust, it may be employed in addition to an adjustment under § 3B1.1 (Aggravating Role); if this adjustment is based solely on the use of a special skill, it may not be employed in addition to an adjustment under § 3B1.1 (Aggravating Role)." The government asserts that the abuse of trust enhancement was due to Ronald Bailie's unique position with the federal government and his control and holding of funds for the government and not for any special skill that he enjoyed. The leadership increase, however, concerned his leadership role in continuing the criminal enterprise. Ronald was the president of the company, and he influenced and directed the actions of Nada and Terri. He also influenced another employee to create the FISAP ledger, despite her reluctance and realization that there was money missing from the trust accounts.
 
 E. Restitution
 
 48
 Finally, the Bailies allege that the district court erred in failing to consider the amount of money returned to the Department of Education by the bankruptcy court in determining the proper restitution amount. After some time, Ronald Bailie presented the bankruptcy trustee with approximately $80,000 in checks from former students in payment of their loans. Now he argues he should receive credit for this amount in the restitution order. We disagree. Agent Rye testified that the checks returned to the bankruptcy court were separate from the checks that the Bailies had deposited into their personal accounts, and therefore, had not been considered in calculating the restitution amounts.
 
 
 49
 AFFIRMED.
 
 REINHARDT, J., dissenting:
 
 50
 I dissent.
 
 
 51
 The majority opinion rests on three fundamental misunderstandings or misstatements of law. First, the majority reads the statute as not requiring a showing of intent to defraud, and therefore concludes that the district court did not err in failing to give an intent instruction. However, the district court's failure to give that instruction erroneously eliminated the statute's mens rea requirement. It therefore constituted a constitutional error, for which reversal is required. Second, the majority assumes that the district court's instruction on deliberate ignorance was given in error, but concludes that the error was both invited and harmless. The error was indeed invited, but it was invited by the government. Under the appropriate standard, the giving of the erroneous Jewell instruction requires reversal. Third, the majority holds that the district court's failure to give an adverse inference instruction was harmless error. In so holding, the majority failed to apply the "harmless beyond a reasonable doubt" standard, Chapman v. California, 386 U.S. 18, 24 (1967). Had the majority done so, it could not have affirmed the conviction. For all three reasons, I dissent.
 
 I. The Mens Rea Requirement
 
 52
 This court has specifically held that jury instructions omitting an element of a crime require reversal. United States v. Gaudin, 28 F.3d 943, 952 (9th Cir.1994) (en banc). See also Roy v. Gomez, 81 F.3d 863 (9th Cir.1996) (en banc) (reversing conviction on habeas review for failure to provide required instruction on specific intent); United States v. Van Nguyen, 73 F.3d 887 (9th Cir.1995) (even in absence of objection by defendant at trial, plain error review required reversal for failure to instruct on criminal intent requirement of a criminal statute).
 
 
 53
 The majority wrongly concludes that 20 U.S.C. § 1097 imposes no intent requirement. The statute imposes criminal penalties on "[a]ny person who knowingly and willfully embezzles, misapplies, steals, obtains by fraud, false statement or forgery, or fails to refund any funds, assets, or property, provided or insured under this subchapter...." 20 U.S.C. § 1097(a). By not construing the statute to require an intent to defraud, the majority eliminates the statute's mens rea requirement and criminalizes a broad range of potentially innocent acts under the misapplication prong.
 
 
 54
 The Supreme Court has repeatedly interpreted criminal statutes as having a mens rea requirement, absent congressional direction to the contrary. See, e.g., Liparota v. United States, 471 U.S. 419, 433-34 (1985). To do otherwise, as the majority does here, would permit a jury to convict a defendant without first finding that the defendant intended to do anything illegal. The Supreme Court, however, has repeatedly declined to construe criminal statutes as imposing strict liability. See United States v. United States Gypsum Co., 438 U.S. 422, 436-37 ("[t]he existence of a mens rea is the rule of, rather than the exception to, the principles of Anglo-American criminal jurisprudence," quoting Dennis v. United States, 341 U.S. 494, 500 (1951)); Morissette v. United States, 342 U.S. 246, 250 (1952) ("The contention that an injury can amount to a crime only when inflicted by intention is no provincial or transient notion. It is as universal and persistent in mature systems of law as belief in freedom of the human will and a consequent ability and duty of the normal individual to choose between good and evil.").
 
 
 55
 The error was not harmless because, absent the instruction, the jury might reasonably have interpreted the statutory terms "knowingly and willfully" to mean that the defendants intentionally used the funds for other than prescribed purposes, but not that they realized that the purposes to which they put the funds were improper or that they intended to defraud the government in doing so. Because the dictates of the Supreme Court are clear that, in the absence of a specific congressional directive to the contrary, courts must construe a criminal statute as including a mens rea requirement, I believe that we are compelled under Van Nguyen to reverse the judgment of the district court.
 
 
 56
 Finally, notwithstanding the majority's valiant effort to distinguish Kammer, it is not possible to do so. The plain fact is that, on this issue, the majority's decision conflicts with the view of the Eleventh Circuit.
 
 II. Deliberate Ignorance
 
 57
 The majority holds that the giving of the deliberate ignorance instruction was invited error, and that it was not prejudicial.
 
 
 58
 The government originally asked that the Jewell instruction be given, but subsequently requested that the instruction be deleted. On appeal, the government has not argued that the instruction was not erroneous; rather, it has simply argued that the error was invited and that giving the instruction did not rise to the level of plain error or ineffective assistance of counsel. Therefore, the majority correctly assumes that the instruction was erroneous.
 
 
 59
 The majority concludes that the error was invited. However, it was the government that invited the error. As the government's argument on appeal acknowledges, both the defendant and the court were led into error by the government's invitation to give the instruction. It is not appropriate, therefore, to place the blame on the defendant. Because the instruction was erroneous and not invited, reversal is required under United States v. Aguilar, 80 F.3d 329, 331-32 (9th Cir.1996) (en banc); see also Gaudin, 28 F.3d 943; Van Nguyen, 73 F.3d 887.
 
 III. Adverse Inference
 
 60
 The majority holds that the district court's refusal to give an adverse inference instruction was harmless error, despite the defendants' specific request for the instruction. In contrast to the majority, however, the Supreme Court has held that when a defendant declines to take the stand, a court's "failure to limit the jurors' speculation on the meaning of that silence, when the defendant makes a timely request that a prophylactic instruction be given, exacts an impermissible toll on the full and free exercise of the [Fifth Amendment] privilege." Carter v. Kentucky, 450 U.S. 288, 305 (1981). Because the error was a constitutional one, this court must review it under the rigorous Chapman standard, which requires reversal unless the panel can conclude that the error was "harmless beyond a reasonable doubt." Chapman, 386 U.S. at 24. The majority chooses not to apply that standard of review, however. If it had, it would have concluded, as I do, that, even if that error were not enough in itself to require reversal, we would still be compelled to reverse because of the cumulative effect of the various errors in the trial--including the failure to instruct on intent, the erroneous Jewell instruction, and the failure to give the requested adverse inference instruction. See United States v. Frederick, 78 F.3d 1370 (9th Cir.1996) (cumulative effect of errors was prejudicial, requiring reversal).
 
 
 61
 It is regrettable that notwithstanding the serious constitutional errors (some of which the majority acknowledges) that tainted the convictions, the majority concludes that no harm was done. The decision borders too closely on the "Well, he did it, didn't he?" school of jurisprudence to be allowed to pass without dissent.
 
 
 
 *
 Honorable Thomas M. Reavley, Senior United States Circuit Judge for the
 United States Court of Appeals, Fifth Circuit, sitting by designation.
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 The jury was instructed as follows:
 Instruction No. 23
 Each defendant is charged in counts 8 through 10 with knowingly and willfully misapplying or embezzling Perkins Loan Funds in violation of Section 1097(a) of Title 20 of the United States Code. In order for defendants to be found guilty of those charges, the government must prove each of the following elements beyond a reasonable doubt:
 First, that the defendant misapplied or embezzled Perkins Loan funds;
 Second, that the amount of the funds exceeded $200.00; and
 Third, that the defendant did so knowingly and willfully.
 If you find from your consideration of all the evidence that each of these elements has been proved beyond a reasonable doubt as to any count, then you should find the defendant guilty of that count.
 If on the other hand, you find from your consideration of all the evidence that any of these elements has not been proved beyond a reasonable doubt as to any count, then you should find the defendant not guilty of that count.
 Instruction No. 24.
 To misapply funds in this case means to use funds in a way that deprives the Department of education of its right to make its own decisions as to how the funds or credits were to be used.
 Instruction No. 25
 To embezzle funds is (sic) this case means to take for defendants' own use, or the use of another, funds belonging to the Department of Education over which the defendants had been given control pursuant to the Perkins Student Loan Program.
 Instruction No. 26.
 The fact that the defendant may have intended to repay the funds at the time they were taken is not a defense. Nor is it a defense that defendants believed they eventually would be entitled to the funds, if at the time funds were taken defendants acted knowingly and with the intent to appropriate the funds to use inconsistent with the rights of the Department of Education.
 
 
 [2]
 Nada's attorney filed a set of proposed instructions with the court. Proposed instruction number 22 simply stated "an intent to defraud is an intent to deceive or cheat." This instruction, without more, is insufficient to call to the court's attention its alleged failure to include intent to defraud as an element of the crime of misapplication. If "intent to defraud" is an element of the offense, we would review for plain error. United States v. Fagan, 996 F.2d 1009, 1016 (9th Cir.1993)
 
 
 [3]
 There are numerous examples of statutes where Congress explicitly indicated that "intent to defraud" is required. See, e.g., 5 U.S.C. § 8505(f) and (g) ("In the absence of gross negligence or intent to defraud the United States...."); 7 U.S.C. § 491 ("[A]ny person ... who shall knowingly and with intent to defraud...."); 10 U.S.C. § 923 ("Any person subject to this chapter who, with the intent to defraud...."); 12 U.S.C. § 1709-2 ("Whoever, with intent to defraud, willfully engages in a pattern or practice of...."); 12 U.S.C. § 1749bbb-12(b)(2) ("In the absence of gross negligence or intent to defraud the United States...."); 15 U.S.C. § 645(b) ("Whoever ... (1) embezzles, abstracts, purloins, or willfully misapplies any monies ..., or (2) with intent to defraud ... makes any false entry ..., or (3) with intent to defraud participates...."); 15 U.S.C. § 645(c) ("Whoever, with intent to defraud, knowingly conceals, removes...."); 15 U.S.C. § 714m(b) ("Whoever ... (I) embezzles, abstracts, purloins, or willfully misapplies any money ...; or (ii) with intent to defraud the Corporation...."); 16 U.S.C. § 831t(b) ("Any person who, with intent to defraud the Corporation...."); 18 U.S.C. § 545 ("Whoever knowingly and willfully, with intent to defraud the United States...."); 18 U.S.C. § 658 ("Whoever, with intent to defraud, knowingly conceals, removes, disposes of...."); 18 U.S.C. § 1005 ("Whoever makes any false entry in any book ... with intent to defraud such bank...."); 18 U.S.C. § 1029 (repeated references to "knowingly and with intent to defraud"); 18 U.S.C. § 1030 ("knowingly and with intent to defraud"); 42 U.S.C. § 3220(b) ("Whoever ... (1) embezzles, abstracts, purloins, or willfully misapplies any monies ..., or (2) with intent to defraud...."); but see 31 U.S.C. § 3729(b) ("Knowing and knowingly defined.--For purposes of this section, the terms "knowing" and "knowingly" mean that a person, with respect to information--(1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required."); 31 U.S.C. § 3801(5) (essentially the same)
 
 
 [4]
 Instruction number 21 provided:
 You may find that the defendants acted knowingly if you find beyond a reasonable doubt that the defendants were aware of a high probability that false statements were made and that federal funds were misapplied or embezzled and deliberately avoided learning the truth.
 You may not find such knowledge, however, if you find that the defendants actually believed that no false statements were made and no funds were being misapplied or embezzled, or if you find that the defendants were simply careless.
 
 
 [5]
 This contention is inapplicable to Ronald Bailie as he testified at trial
 
 
 [6]
 The court instructed the jury that,
 Violation of a civil regulation is not, in and of itself, a crime. You are instructed to consider evidence of the various Department of Education regulations presented in this case only insofar as they are background to the crimes charged and only insofar as they may bear upon the motive and intent of the defendants.